Freeman, J.,
delivered a dissenting opinion as follows:
These cases are brought to this court to test the validity of an act of the legislature of Tennessee of' March 15, 1875 [Acts 1875, ch. 23], abolishing the second circuit and second chancery courts of Shelby county. The question presented is whether said act is constitutional or not.
The question presented is one of gravity, as every case is, in which the judicial department is called on to decide upon the validity of an act of the law-making power, a co-ordinate branch of the government. Yet this duty legitimately under the constitution, devolves upon the courts, and should be performed as fearlessly and with as little hesitation as any other function assigned to them, when a proper case is presented demanding its performance. We are aware that it has been usual in courts to express their deference for the action of the legislature in language somewhat stronger than we have used, influenced no doubt by habits of thought, originally tinged by the influence of the pervading theory of the English law — the parliament of England was omnipotent. In fact so far reaching and pervading was this influence, that in the earlier days of the republic, it had been made a serious question whether this power *369 was confined to tlie courts, or whether' the legislatures themselves were not the judges of their own constitutional limitations.
The received and universally adopted doctrine with which we are now so familiar, was probably first unhesitatingly announced by Chancellor Kent, and vindicated with his usual force and power of reasoning in an introductory lecture delivered to a law class in Columbia College, New York, in 1794, in which he refers to the fact that the question “had in many cases inspired serious doubts and difficulties.” See Lecture in Bench & Bar, Api., 1870, pp. 7, 8. This cannot be wondered at when we remember the fact that this was a new feature in government, peculiar to our constitutions, and that no such view, as Channcellor Kent says, had been ever entertained up to that time in the European world, as that of placing constitutional limits to the exercise of legislative power. We adopt, with slight, modification, as a proper expression of the true principle, the language of Chief Justice Marshall in the case of Dartmouth College v. W oodward: “On the judges of this court [then] is imposed the high and solemn duty of protecting, from even legislative violation those rights [contracts] which-the constitution of our country has placed beyond legislative control, and however irksome the task may be, this is a duty from which we dare not shrink.” [4 Wheat.., 625.]
Had the legislature the power to abolish these courts and deprive these judges, holding their commissions from the governor of the state, in accordance with the constitution, for the term of eight years, of their offices, by a legislative mandate saying they “shall be abolished,” and repealing the act of 3869 [1869-70, ch. 28], by which they were ordained and established in so far as it was in conflict with their enactment?
This question, as well said by the attorney-general in his argument, depends mainly for its solution, probably, if not *370 certainly, on the construction of three provisions of our constitution. We proceed to examine that instrument in order to its determination.
By article 2, section 1, the powers of the government are distributed into three departments, the legislative, executive and judicial. In succeeding articles the powers of these departments are defined.
By article 6, section 1, it is provided: “The judicial powers of this state shall be vested in one supreme court, and in such circuit, chancery and other inferior courts as the legislature shall, from time to time, ordain and establish; in the judges thereof, and in justices of the peace.”
By section 4 of this article, it. is provided: “The judges of the circuit and chancery courts, and of other inferior courts, shall be elected by the qualified voters of the district or circuit to which they are to be assigned,” and his term of service shall be for eight years.
In arriving at the construction and effect of these provisions of the constitution, we are but to- seek for the meaning and intent of the people in adopting it. But this intent is to be found in the instrument itself. Effect is to be. given if possible to the whole instrument, and to every section and clause of it. If different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may malee some idle and nugatory. This rule is especially applicable to. written constitutions, in which the people will be presumed to. have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible for implication. One part is not to be made to defeat another, if by any reasonable construction the two can be made to stand together.
Implications must be necessary, not conjectural or merely argumentative, and we add, especially should this be so, where a plain provision is to be qualified by them. We *371 have given these principles from Mr. Cooley on Constitutional Limitations, pp. 56, 57, 58, 64. Guided by them, in connection with such other principles as may incidentally be referred to, and such, other clauses of the constitution other than the ones cited, as may aid us, we proceed to the question presented for decision.
It is argued for the state, substantially, that by section 1 of article 6; the right to “ordain and establish” what courts shall be, involves of necessity the power to determine what shall not be, and therefrom he deduces the power exercised in this case. Is this a fair conclusion, taking the constitution as a whole on this question, and not confining ourselves to the words quoted? At the time of the adoption of this constitution in 1870, we had our present system of courts, both circuit and chancery — the very courts now in controversy had been established by the act of 1869 [Acts 1869-70, ch. 28]. The convention evidently intended to continue this system or apportionment of the judicial powers of the state. If they had used no other language than the words quoted, on which the proposition rests, as to what courts this power should be vested in, then the inference drawn and statement made in the proposition might possibly have been legitimate. But they have not done this. By the constitution of 1834, this article 6 distributing the judicial powers is as follows: “The judicial power of this state shall be vested in one supreme court; in such inferior courts as the legislature shall from time to time ordain and establish, and the judges thereof.” Thus specifying no particular bind or character of such inferior courts which the legislature should establish or ordain. Whence the change-and why the insertion of the circuit and chancery courts? It is a well known fact, to which we may well refer, that a prejudice had existed in the minds of many against the existence of our chancery courts as they then existed, with repeated efforts to abolish them. In order to prevent this, and to effectually guard the sys- *372 tern, of courts then in existence, these courts are placed in this clause, and thus imbedded in our system beyond legislative destruction by a requirement in tlie organic law that these courts shall certainly be the repository of the judicial power of the state. This we believe is conceded. The legislature might, in addition, establish other inferior courts to them, but these courts are courts created or recognized by the constitution, or necessarily demanded by its requirements, as having directly vested the judicial power in them, whatever other inferior courts might be established by the legislature in the future.
"W e do not think it can fairly be maintained that these courts stand on no higher ground than such other and different inferior courts, not included in the well understood terms, “circuit and chancery courts,” -which the legislature is -authorized to ordain and establish, such as criminal courts, and perhaps others. If so, the convention has effected nothing whatever, practically, by the addition of the words “circuit and chancery” in this clause, and the whole object known to be intended, the protection of the chancery court, and we may add, the present circuit court system, is left precisely where it was by the constitution of 1834. Under that constitution, it had long been recognized., though not definitely decided perhaps, that it was optional with the legislature what character of inferior courts the legislature should establish as the depositories of the judicial powers. This was intended to be changed, and was changed by fixing the circuit and chancery courts, as two well-known courts that should exist under and by virtue of the constitution — not leaving it to the legislature to say whether they should exist or not. They must exist, and that while this constitution remains, or this clause or provision of the constitution is in operation. They were in existence at the time, and by these words it is ordained, and was meant that- they should continue to exist in faci-as a part of our system, and a leading feature in it — not by *373 virtue of tie acts of the legislature creating them originally, but by the imperative mandate of the organic law. If the legislature had repealed the law establishing this system and these courts, by a law which would take effect after the adoption of this .constitution, we take it these words in article 6 would have superseded that repeal, and of themselves have perpetuated the life of these courts, without the necessity of further legislation to create them. They exist and have their being and vitality, so to speak, by virtue of their being named in this article of the constitution, as permanent constitutional courts, a part of our judiciary system, which the constitution guards and protects, because deemed important to be thus preserved and perpetuated. That this was the purpose of the convention, is made certain by the fact stated, that it was intended especially to guard the chancery courts from legislative abolition. It is well known that they were subject to legislative discretion, under the constitution of 1834, and might be abolished under the very words found in our present constitution, by which the power is now inferred to abolish the two courts, the subject of this discussion — the power to establish such inferior courts, etc. Therefore the addition of the words “circuit and chancery courts,” as a permanent barrier to the -exercise of this power over the courts mentioned in the future. It was so intended, or nothing was really done or intended to be done by the insertion of the names of these courts in the article cited. If this be the true purpose; then to maintain a power granted in the same instrument, that includes necessarily the opposite of this, is to make one part of the instrument contradict and render nugatory another part, contrary to the axiom we have cited from Mr. Cooley; and to say that the constitution establishes that which it has given power to the legislature to destroy, is a legal aud logical contradiction, which will not he seriously insisted on. We will attempt to show in a subsequent part of this *374 opinion that this is a. logical sequence from the' premise assumed.
It is claimed in argument, that what is created by the legislature may be destroyed by it. That an office created by this body, haying its existence solely by its will, may be deprived of its existence by the same body. This may be conceded as true, and if the circuit and chancery courts of the state are such offices in the sense of the rule, then it follows the law creating them may be repealed- and they will cease to exist. The argument of the attorney-general and the counsel for state, assumes that to be the case from the words “ordain and establish and such,” but do- these words, when interpreted in the light of other parts of the constitution, as well as the previous part of the section in which they occur, carry in them the sense of creation of circuit and chancery courts by the legislature? By the then and now existing system of organization of our courts, our state was divided into circuits and districts by an act of the legislature, in each of which a circuit judge for a circuit and a chancellor for a district held his office. Section 4 of article 6 provided that the judges- of the circuit and chancery courts and other inferior courts, shall be elected by the qualified -voters of the district or circuit to which they are to be assigned, and shall -be a resident of the state five years and of the circuit or district one year. In view of our legislation on this subject, and the then organization of our judiciary system, this clearly meant to recognize, and involved the duty of the legislature to establish or define, the districts and circuits in which the judges should be required, and thus define geographically the portion of the state the voters of which should elect him, and in which he should haAe resided twelve months before his election. This designation of a circuit is a necessary prerequisite for the election of a judge for that particular territory, and the creation of the district or circuit would necessarily involve the assignment of a judge to such circuit or district, *375 and in this sense the legislature ordains and establishes circuit and chancery courts, that is, new ones, not then existent, and had already ordained and established these existent at the adoption of the constitution, the continued existence of which was perpetuated, that is of the circuit and chancery courts, judges of which are absolutely necessary to their complete and practical vitality.
We do not mean to be understood as holding that the limits of the circuits and districts as defined by the law at the date of the constitution, must remain, but we do mean that the courts, that is circuit and chancery courts, as depositories of the judicial power, were intended to be perpetuated. This intention is beyond all question, and in the case of the chancery court is conceded by the counsel for the state.
But to recur a moment to the main question, in what sense does the legislature “ordain and establish circuit and chancery courts?” Is it in the sense of creating them, and do they exist by virtue of the legislative will absolutely or by virtue of that clause in the constitution, which says the judicial power of the state is vested in circuit and chancery courts? Manifestly the latter, or else these courts exist precisely as they did under the constitution of 1834, and as we have said, the convention failed to make a change intended to be made by them. From what we have said, the legislature only lays oh circuits and districts, provides for an election, but when this is done, the judge or chancellor is provided for by the constitution, and is elected for eight years in pursuance of its mandate — the legislature in providing for the election, only doing so because the constitution requires a district or circuit and a judge to be assigned to such district or circuit.
There are a number of offices that are created solely by the legislature, such as tax collector, superintendent of public instruction, county superintendents, and the like. These officers may all be deprived of their offices, by a law *376 repealing the one creating their offices. Does a judge of the chancery and circuit courts stand on no higher grounds than these under the constitution of 1870? Are these offices created by the legislature in the same sense as the offices to which we have referred? Certainly not. What is the element of difference? It is the fact that the office which is contemplated by the constitution to be filled by a judge or chancellor, exists by virtue of the constitution, while the others exist by the will of the legislature. Yet if the construction maintained be sound, what is the difference in the office of a judge or chancellor, and a county superintendent of public schools, or superintendent of the capitol? Hone practically. The legislature creates the latter class of offices, and may abolish them. On the argument I oppose, the legislature establishes the circuit and chancery courts, and may by the same means abolish them. It follows on this theory that the legislature has the sanie power to abolish a constitutional office as one created by itself; an establishment by the constitution stands on no higher grounds than an act of the legislature. This conclusion will not be maintained. In fact I am struck by the fact that no one is willing to follow and adopt the legitimate consequences of the positions on which the law in this case is sustained.
The result of these views is, that the office and officer are created by the constitution, the district and circuit are defined by the legislature. The legislature may lay out and define the district and circuit, may modify and mould these as they please, in accordance with public need, but the office is independent of their will- — exists by virtue of that which is above the legislature, and to which that body is subordinate and which it can only obey.
It is said the system of circuit and chancery courts is established and perpetuated by the constitution, but not the officers or judges. But a system of courts is an anomaly without judges, would be a mere abstraction with nothing *377 of substance in it — is too thin and shadowy for the practical work of a constitution of government for a state. The system of necessity involves the officers as well as the offices the judges or -else we can have no courts.
Another view of the argument of the attorney general, we think demonstrates the fallacy that underlies it. The argument is that the power to ordain and establish, or as he puts it, to say what courts shall be, involves of necessity the power to determine what shall not be. Let us test this argument in its full force and breadth — assume its correctness, and inevitably it follows that the legislature have the power to say that circuit and chancery courts shall not be at all, or to use the language of the argument, “to determine they shall not be,” and thus the entire system be destroyed and we have nó courts, such as the constitution has confided or vested the judicial power of the state in. We concede this as a matter of fact is not to be anticipated, but the question is one of power, and if the fact that the legislature may lay off districts and circuits, and thereby create under the constitution the necessity for judges and chancellors in these divisions of the. state, involves the power not only to say what shall be, but also what shall mot be,, affirmatively. Then they may say we shall have no courts of this kind at all, and that by virtue of a constitutional enactment. We take it that the power legitimately possessed on-this subject is not, under this clause, commensurate in its power of destruction to its other power to organize districts and circuits, under which a judge or chancellor is required by the constitution. In other words, that while the legislature may decline, and by inaction prevent the creation of any additional judges and .chancellors, by not increasing the number of circuits and districts, that this non-action and its results is clearly distinguishable from affirmative action, by which they abolish and destroy that which has been done, and which when called into existence has its life and term of service given by the fundamental *378 law- In fact it may well be argued, that to create a necessity for a judge by laying off a judicial district is a very different thing from the removal of a judge, either by direct or indirect action. The creation of this necessity — that is, by laying off the district or circuit — is provided for by the constitution, the removal of a judge is'likewise provided for by express terms in the same instrument, but not in this way. Why not look into the latter case to the mode prescribed by the constitution, as the measure of the power, as well as in the first. We can see no good reason for a difference. The argument really assumes unlimited power over the existence of circuit and chancery courts by the legislature, for, to say the constitution established a system, of circuit and chancery courts, which courts can have existence alone by the will of the legislature, and that the legislature have the power conferred to say they shall not exist, is to say that the constitution is inferior and subordinate to the will of the legislature, and that the constitution has failed to establish or perpetuate these courts as a part of our judicial system at all; for that which another has a power conferred to-create and destroy, exists only by the sufference of that power, and not from some other and different source. This we think an inevitable conclusion from which we see no fair mode of escape.
It is said that a law abolishing all circuit and chancery courts might be unconstitutional, but that a law abolishing but one or two, as in this case, stands on different grounds. That the legislature may well, in accord with their views of the public good, abolish such courts as are not deemed to be demanded at any particular time, yet this would not be a violation of the constitution as would be a general law abolishing all such courts. I think this necessarily and logically involves the proposition that, while the whole is protected the parts are not- — that while the circuit and chancery courts in general are perpetuated by the constitution, no one, two or twelve are so protected and perpet- *379 Bated. That while they cannot he abolished all at once, they may be abolished one by one. in detail. I can see no escape from this conclusion, unless we confined a limita-tion prescribed as to the number that shall remain, and none is found. The proposition necessarily leaves the continued existence of these courts, as a matter of fact to the discretion of the legislature, and this must be the practical result. Yet in its terms, it involves the assertion by fair-implication, that such power does not exist, as it asserts that all the courts cannot be abolished by a law .expressing in plain terms such a purpose. In other words, the power denied to exist by the first part of the proposition is necessarily affirmed or claimed to exist in the second, or rather necessarily exists and results from the second part of the same proposition- — that is, that one or more may be abolished at the will of the legislature.
If one or more at one time, why not ten more at another, and thus all be swept away? And on the view suggested, where shall we find any barrier to legislative action in this direction? All are necessarily left to the mercy of legislative discretion, and no one or even ten, finds any shelter under the constitution, but each is -equally exposed to- destruction. This is the only result we can see, as the logical sequence of the assumption of the power to abolish, as exercised by the legislature under the law now under discussion.
But it is argued that the legislature have the power to ordain and establish, and are to be the judges of what circuit and chancery courts they will ordain and establish, and that it follows, they may -equally abolish and destroy such circuit and chancery courts when established by them. As intimated in a previous part of this opinion, if this re-suLtis to follow, then the legislature has uncontrolled power over these courts, and they do not. exist nor are they established in any practical sense by the constitution, but by the legislature alone, and their establishment by the constitu *380 tion is only equivalent, to a. request or suggestion in the constitution to tlie legislature to create them, which may be disregarded at will, and which if complied with, and the courts brought into existence, may be at any time changed and the courts destroyed. This follows, we think, beyond question from the premises. Let us see its practical working.
It is conceded, and is well known, that the chancery courts were intended to be put beyond the power of the legislature to destroy them. If the legislature can, by repeal of a law. establishing one or more of them, or organizing chancery district requiring the election of a chancellor destroy one court or two, then it may do the same as to five, ten or all the districts but one, and then as a question of power, why not the one ? Which one is protected and beyond its power? Who can designate the saved and protected court or courts, for all stand precisely alike under the constitution? As all stand on the same ground,, a power to destroy one involves the power' to destroy all. Then tire supreme fundamental law of the land is a dead letter, and falls before the will of its inferior, the legislature.
The chancery courts, then, are not protected by the constitution, but are at the mercy of the legislature, and may be swept away at any session of that body, and thus so much of the judicial power vested by the constitution be divested and find no organ through which it is to be administered. This would leave us a show of the system— that is, the system would be in the constitution, but not in the practical administration of the government. The courts would exist in the constitution, but would be mere myths, while a law of the legislature would exist, which forbade their real existence, as practical, vital organizations, and they would not be in fact at all.
Which shall prevail and override is the question. The changing, ever shifting will of the legislature, or the supreme will of the people, placed in it permanent, enduring *381 form in tlie constitution? I am bound to say, the constitution must be and is supreme- If so., then the legislature cannot destroy the courts created by it, nor can any power be exercised by the legislature, be it in one instance or many, on one court or a dozen, that involves such a result. In a word, I can see no limit to the exercise of the power to abolish and destroy, except legislative discretion, if once conceded to exist; and, therefore, must hold it does not exist at all in reference to the circuit and chancery courts. When any practical limitation can be shown to exist in the constitution to the exercise of the power claimed that will preserve these courts from the power of legislative destruction, then I could admit the soundness of the opposite view, but not till then.
It is maintained that this matter is confided to the sound wisdom and discretion of the legislature, in order to meet the wants and exigencies of the country. It is conceded so far as the power is given them to lay off circuits and districts are concerned, but the power to’ abolish is not granted, nor the power in this way to deprive the judges of these two courts of their office at their will; nor indeed can it be allowed, without involving the power to utterly abolish and destroy the entire system established by the constitution. This would be to confer a power on the legislature to destroy that which the. constitution had established, an absurdity which we cannot assume to have been committed by a convention, without treating that body of able men with most undeserved disrespect. In addition, this power would have to be drawn out and evolved by an inference, and not based on the express language, or even necessary construction of what the convention has said in the constitution itself. The inference is drawn from the words “such” and “from time to time ordain and establish,” but I think these words do not compel or necessarily sustain the inference drawn from them, while the recognition of, and vesting the judicial power in them by the constitu- *382 tión with the conceded purpose of securing the chancery courts, at least, from legislative destruction, entirely, and, as I think, unequivocally forbids the inference on which the arguments rests. ¥e conclude that the power to abolish and destroy is not under this clause, commensurate with the power to ordain and establish as this language is used in the constitution, and that these words do- not include in them, in the sense of the general rule, the idea of a power to create absolutely, but only in the qualified sense Ave have indicated, and that this power does'not carry with it, the poAver to destroy or abolish.
The above conclusions, I think, are in accord Avith the rules I have cited from Mr. Cooley in the commencement of this opinion. We seek the meaning of the constitution, but must find it in the language of the instrument itself. Effect must be given, if possible, to the entire instrument, every section and clause of it. If different portions seem to conflict, we must harmonize them, if practicable, and fa.vor that constitution that will render every word operative, rather than one which may make same idle or nugatory. This last rule is laid down as peculiarly applicable to Avritten constitutions, and one of controlling influence in their construction.
We think Ave have shown that to- concede the power claimed would render the establishment, by the constitution of circuit and chancery courts, nugatory, and leave their continued existence to the will of legislature. If this is true, then the rule is conclusive in its application to this question, and we can only assent to the opposite views by disregarding it, which we are not authorized to> do. It is based in the soundest philosophy, sustained by an unbroken current of authority, and may be Avell said to be axiomatic, that is so well established as to need no citation of authority to sustain it.
We need but refer here in passing, to the ingenious argument of connsel, drawn from contemporaneous and con- *383 tinturas construction of the language of the constitution of 1706 and 1834, as to the courts established under them.
The language of that of 1796 is, “The judicial power of the state shall be vested in such superior or inferior courts of law and equity as the legislature shall from time to time direct and establish.” It is evident that the language is not tlie same nor is the purpose the same as in the constitution of 1870. The language of the constitution of 1834 is, “The judicial power of this state is vested in one supreme court; in such inferior courts as the legislature shall from time to time ordain and establish,” etc.
This language, certainly that of 1834, left the legislature entire discretion as to what inferior courts it should create, and it might well be conceded that such courts were the absolute and unqualified creation of the legislature, without impairing the force of the view we have taken. ISTo circuit or chancery courts were expressly provided for, but all was left to the legislature, and such office, the same body under the general rule might abolish, and the officer thereby cease to hold it. That this view was taken by the learned jurists who have presided in this court, who have been cited, is very true, and we concede its proper weight as coming from them. Yet we cannot feel its force, as bearing on the constitution of 1870, where a different and specific provision is made, effectually establishing and intended to perpetuate the existence of circuit and chancery courts, and to place their continued existence beyond the power of the legislature to destroy. This would be to give contemporaneous and subsequent construction of one constitution, and its provisions a controlling influence over another, adopted and using language purposed to change the former, and thereby by such construction, make the latter, an altered constitution, conform to the first, nothwithstand-ing an indirect opposition to the expressed and well known purpose and intent of the latter.
We need not discuss the weight due to contemporaneous *384 construction, as we think it can have no application to the case in hand, unless we assume the provisions are the same, which are different and as well known, purposely intended to he different for the reasons hereinbefore stated.
We now turn to an additional argument founded on other constitutional provisions, which we think gives support to the view above expressed.
This whole case really involves the power of the legislature to remove a judge from his office in the mode attempted. The object- was, no doubt, on the part of the legislature, to economize and save the state the expense pertaining to -the offices. This purpose is not and cannot be questioned. That the necessity for this step, and its expediency were deemed clear and satisfactory to that body, we have no right to doubt in this aspect of the case. They certainly so adjudged,'and for the reasons we have stated. But it is equally certain that no such law would have been enacted, except with a view and purpose of depriving these judges of their offices. To .continue them as judges, and as such entitled to'their salaries, would not have served the purpose designed by the law under consideration. This direct aim, however, is not expressed on the face of the act, and no judge is referred to by it. Only the courts are-abolished, but with the certain purpose of effecting the other end mentioned. If that body had possessed the power of depriving the judges of their offices by a direct enactment, it would have been the proper mode of reaching the end designed, and even if they could have done so, and left the offices still in existence, with a provision that no successors should fill the vacancies, the end designed would still have been reached. I take this to be unquestionable. I take it too, as a matter of fact, as well as due to the legislative body, that no personal objections existed against the incumbents of the offices in this case. They were men of unspotted character, and no grounds existed on which they might have been removed from -office for malversation in *385 office, or failure well and faithfully to perform the duties assigned them.
This being so, ought we not in fairness to treat this act in reference to its real end and purpose, and test its validity by ascertaining whether, under the constitution, a judge can thus be removed, rather than by the idea whether a law establishing certain courts can be repealed. I think this is but a fair and reasonable view of the question. On this aspect of the case the constitution has left nothing to inference or deduction. It has expressly provided two modes by which a judge or chancellor shall be deprived of his office. Hirst, by impeachment, “whenever they may, in the opinion of the house of representatives, commit any crime in their official capacity which may require disqualification; but judgment shall only extend to removal from office, and disqualification to fill any office thereafter.” [Art. 5, sec. 4.] The mode of conducting this proceeding is pointed out in the instrument, and the body which shall adjudicate the question of guilt is pointed out. Art. 5.
The other mode is found in sec. 6 of art. 6, which provides for removal by a concurrent vote of the tro houses, each house voting separately — two-thirds of the members to which each house may be entitled must concur in this vote. This is not based on crime in his official capacity, but the right may be exercised for other causes, but not, we take it, without cause, or at arbitrary discretion of the body; for it is provided the cause or causes of removal shall be entered on the journal of each house respectively.
In these clauses of the constitution the modes of removal are expressly provided for. In the first for official crime by impeachment.' In the second, without crime, but for all other proper causes of removal known to' the constitution, and all conceivable causes for which a judge or chancellor may be removed from his office. If this be so, the maxim that the' expression of one thing is the exclusion *386 of another, comes with peculiar and exclusive force in its application to the question under discussion, for it is impossible, as we have said, to find a proper canse of removal of a judge from office that is not included under one of these provisions, and if so, then in any case for removal, the mode hv which it shall he done is definitely pointed out in the constitution, with its proper safeguards and restrictions. involving a trial or hearing, and the principle of responsibility on the legislature for the act, as a check upon improper action.
If the mode pursued in this case can be sustained, all these safeguards are set aside, and any judge obnoxious to his own immediate! representatives, it may be without cause, or even for the faithful performance of his duty, is liable to be brought down from his honorable position, disrobed of his office, under the specious guise of economy, and a repeal of the law establishing his circuits or district. Such matters being deemed of local interest, will not and do not challenge the scrutiny of members representing other localities, nor will they feel any special responsibility for their votes on such a question, their own immediate constituents having no personal interest to be affected by their action. But put the question directly to the same men, of a direct removal of a judge from office, as required by the constitution, and at once a sense of responsibility attaches to the act as involving either elements of degradation and official crime of a high official, or at any rate, an unfitness for the office, rendering it improper that he should longer hold his place. In this view, we can see a reason of weight against a departure from the causes and modes pointed out by the constitution when such an officer is to be deprived of bis office.
But, in addition to this, the opposite view involves the idea that for proper canse, the judge shall be impeached, or may be removed by a two-thirds vote of both houses, hut without such cause at all he may be as effectually re¡ *387 moved by a simple enactment of tbe legislature, carried in both, houses by a bare majority, it ma.y be of only one vote in each, house. We are unable to see how such action can be authorized on any rule of construction found in any sound principle, or any decided case from any court known to us. Would not this holding be necessarily based on the idea that one clause of the constitution, or an inference drawn from it, shall be held and construed not only to conflict with another plain and definite provision, but shall overturn it and render it nugatory? The power to ordain and establish courts, be held and construed to authorize a removal from office, in a mode different from, and directly in contravention of the mode pointed out in the unequivocal clauses expressly providing how such acts may and shall be done. If this be so, such construction must, on the principles we have cited, be unsound and unwarranted, and the action in this case clear violation of the constitution. I cannot see how this'conclusion can be avoided.
I have examined with care the ingenious and able argument presented by counsel on the part of the state, and in favor of the validity of this law, but I do not think they have weight enough to overturn the vieAvs given above. Difficulties have been presented and arguments' from views of policy that well merit consideration, but the length of this opinion at this point forbids that we should go into a particular discussion of all of them. On the question of power to do what has been done, we think them inconclusive, as all arguments from policy must be on such a question. No case has been cited or presented to us that with the question presented before the court for adjudication, sustains the views of counsel.
We think, the want of power in this case is clear and beyond question, and so must hold. We cite a number of cases from courts of the highest respectability in our sister states holding or enunciating, with great force, views in accord with the conclusions we have reached, which we *388 deem most persuasive, though not conclusive, in favor of their correctness. See Commonwealth v. Gamble, 62 Pa., 344: Ballow v. Dubois, 25 Ill., 547; State v. Wissmore, 14 Wis., 163: 24 Ill., 184; 6 Cowan, 642.
If I have erred in these conclusions, I have the satisfaction of being sustained by the opinion of these courts, and after careful examination, find no case in which the question in judgment has been held to the contrary. On the question of removal of a judg’e, I add a few other considerations.
The force of this aspect of the question was felt by counsel, in so much that it is argued that there are three modes of removal of a judge provided for in the constitution. The two we have cited, and the one now under consideration — -by abolition of his court. But the clause of the constitution giving this last mode in terms, is not and cannot be pointed out. It is an inference to be drawn from a premise based alone on the power “to ordain and establish.” But this inference, is, I think, a most strained one, finding no proper support in the language used. The article does not purport' to confer any such power. It is on a different subject entirely — says nothing of the power or mode of removal. This subject is provided for in distinct terms, under a separate head, and the mode of doing the thing clearly pointed out. Is it not strange that when providing for the very matter in hand, the convention has failed to mention this one mode, and that a mode most desirable, as in the view maintained, one so' far demanded by public necessity, in some cases, at least, as to require that it shall be inferred and reasoned out, where the convention has failed to grant it by express terms ? How easy to have added to the causes and mode of removal in tire constitution, “also by abolishing a court or courts when deemed expedient.” Would not this have made the power clear, and would it not have been a most material addition to the constitution? I think it would. Yet the argument *389 must assume that the constitution is precisely the same as if such a clause had been added. When we add the consideration already adverted to, that every conceivable cause for removal of the judge is included in the modes of removal provided for, the position maintained involves the idea that after expressly providing for every conceivable cause of removal, one mode was left out of the constitution, with no safeguard around it, to be used by the legislature at its discretion, without any cause, thus leaving the judicial terms at the mercy of the legislature— only the law must operate by indirection. If you impeach, it must be for official crime. If you remove by a two-thirds vote, you must have a cause to spread on .the journals. These are the direct modes of removal provided for. But in case the legislature cannot find warrant for action in these direct and constitutional modes, then it has but to avoid the difficulty by doing another thing — abolish the court, and the judge goes with it — his commission for eight years is cut down to the period when his court is abolished —it may be three years, or even less, and the result provided for and guarded by the constitution with powers and restrictions, in prescribed modes of action, is attained without compliance with either of them. The constitutional provisions are evaded or cunningly avoided, and has well been left out of the instrument for all practical purposes. It appears to' me that this reasoning leads to an encomagement of the policy of avoiding by indirection plain provisions of the constitution, and as such, its tendency is to evil, and only evil in a constitutional government. I am unable to bring my mind to assent to' it.
One other argument which may be presented in favor of the view that I have combatted, and I conclude.
It is that although the legislature might abolish all our chancery courts, or all but a nominal number of them, under the theory they could not do so without a palpable wrong so clear that the members would be guilty of moral *390 perjury. But why is this so? Can it be 'for any other reason than that the constitution has provided for and established these courts? The legislature being sworn to support that instrument are bound not to interfere with them. If this be so, then I ash again, which one or ten may the legislature rightfully and constitutionally destroy without a violation of that instrument? If no one is protected, there could be no violation of the constitution in abolishing them all. It is a matter of discretion with the legislature. If one is protected, all are, for all stand on the same ground.
I conclude by a short reference to the evils attending the construction contended for by counsel for complainants — evils that I think strike at the very foundation of judicial independence, and tend to lower the high standard of elevation that in theory has been always the aim of our constitutions to give to this, the most important department of our system of government.
If the theory maintained be sustained, every circuit judge and chancellor holds his office not under and by virtue of the constitution, but under the variable will -and discretion of the legislative body — for, as I have shown, if the power exists, it is without limitation as to its exercise any more than is the passage of any other law by that body. Instead of these judges, before whom come in the first instance, almost all the rights of property and liberties of the people, holding their judicial teims under the unchanging and supreme mandate of the fundamental law, they have no higher security for it than the .'ever shifting and changing breath of popular opinion, as expressed through its representatives in the legislature, llore: than this, as we all know, on such a question the voice of only a few representing the particular locality is likely to be most potent, and probably controlling on the question of abolishing a court in their own section. So that, practically, the judge will hold his office at the pleasure of a few men, *391 it may be, ambitious politicians, wbo, for any fancied offense, or failure to serve their purposes, may have him stripped of his official robes and degraded from his high and honorable position, and then in triumph go before the people and vindicate this act on the score of public ecom onmy, when, in fact, it was prompted by motives of personal malignity — it may be of corruption — and because the judge had dared, in the discharge of his duty, to refuse to bend to his will,’ or subserve his personal ends, or lend the aid of the judiciary to his personal aggrandizement.
While we feel no hesitancy in saying that no such motives can be attributed to the body which enacted the law now under consideration, such results as we have indicated are clearly included in the power claimed, and should be carefully guarded against. They should warn us to beware of yielding to a construction of the constitution involving such possibilities, unless compelled to do so, by language plain and unmistakable in its import. While the history of our country may furnish as yet no examples of such evils as we have suggested, the tendency of the times and the tone of political morality, which we are compelled to observe, tell us in a voice we ought to heed, we cannot too carefully guard the independence of the judiciary from all possible assaults upon its integrity and independence.
In view of these facts, I do not feel that there is any reason that should-incline us to favor the view urged upon us, that the legislature, under the constitution of 1870, has unlimited control over the existence of our circuit and chancery courts, and of the term of office of the judges of said courts.
This being my conclusion on the question of power, I have but to announce the result. Consequences are not for us in such a case. However, I see no results to be apprehended from the view I have taken, seriously prejudicial to the interest of the state, and only carry out the purpose *392 of tbe convention in perpetuating these courts, by putting them above legislative destruction, to the extent I have declared in the above opinion. I am content to have the rights of the parties, both people and judges, guarded by the supreme law of the land.